IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 3:07CR433–HEH |
| | ) |
| DANNY DAMON SMITH, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The defendant in this case entered a plea of guilty to Conspiracy to Distribute and Possess with the Intent to Distribute 50 grams or more of Cocaine Base. Predicated on prior drug-trafficking convictions, the government filed an Information, seeking a sentencing enhancement pursuant to 21 U.S.C. § 851, elevating the mandatory minimum sentence to 20 years. As part of the Presentence Investigation Report, the U.S. Probation Officer computed the defendant's sentencing guidelines under Sections 2D1.1(a)(3) and 2D1.1(c)(4) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). These sections pertain to drug distribution related offenses involving at least 150 grams but less than 500 grams of cocaine base. The probation officer also added two levels for possession of a firearm. This resulted in a Total Offense Level of 32, a Criminal History Category of V and a guideline sentence of 240 months.

Both the defendant and the United States filed objections to the Probation Officer's guidelines calculation. Alleging that the defendant was involved in the murder

of a government informant in retaliation for her cooperation, the United States urges the Court to apply the cross reference to first degree murder, pursuant to U.S.S.G. § 2D1.1(d)(1). The defendant opposes the cross reference and the firearm enhancement of two levels under U.S.S.G. §2D1.1(b)(1). Both sides have filed detailed memoranda supporting their respective positions. The Court heard extensive evidence and oral argument on December 16-17, 2008. Because the evidence is scant, conflicting, and of questionable reliability, resolution requires close scrutiny and careful analysis.

The evidence revealed that shortly after midnight on December 2, 2006, the bullet-ridden body of Fannie Beard ("Beard") was discovered in an alley adjacent to 1907 Whitcomb Street in the Whitcomb Court area of Richmond. She had been shot nine times with a .40 caliber firearm, once in the abdomen and eight times in the back. Beard, who was commonly referred to as "Patsy," was well known in the Gilpin Court and Whitcomb Court areas as a federal informant. She had earlier testified in U.S. District Court against a member of the notorious Brick Yard Boys or BYB, a gang operating in Gilpin Court, an area with a reputation for drug-trafficking activity. In fact, in her capacity as a federal operative, she had made a controlled drug buy from the defendant, an acknowledged member of the BYB gang.

Beyond these and a few other skeletal facts, the evidence diverges widely. The government contends that the defendant was the assailant. The defendant steadfastly maintains that the evidence points to Ross Leach ("Leach"), who admits being present at

2

the scene.

Aside from Leach, the sole eyewitness was Barbara Barbour ("Barbour"), a resident of Whitcomb Court. While returning to her apartment that morning, she observed Beard exit her apartment building and approach a white Lincoln. Beard was wearing bed clothes and flip flops. Barbour next saw a black male wearing a grey-hooded sweatshirt, with his face concealed, emerge from the portico of 1907 Whitcomb Street. The person she observed turned the corner into the alley where the white Lincoln was parked. Seconds later, she heard several shots fired. Barbour claims she immediately took cover in a nearby trash dumpster. She heard additional shots fired, a car door close, and the Lincoln pull off. She then crawled out and was eventually interviewed by Richmond City Police detectives and FBI agents.

In recounting the events of that morning, Barbour told the investigators that she was familiar with the white Lincoln in the alley. She had previously seen it being driven by Leach, a young man whose mother resided in the same building from which she had seen Beard exit. Barbour claims to have had only a momentary glance at the shooter whose face was still covered by the hood. She noted, however, that the shooter could not, in her opinion, have been "Ross," because the shooter was taller and lighter skinned. Although Barbour appeared to be fairly cooperative from the witness stand, she had previously refused to testify before a federal grand jury.

Leach, who is currently serving a 30-month sentence for withholding evidence

3

from federal agents in connection with the Beard investigation, was called as a government witness. Leach admitted being present at the homicide scene and driving a white Lincoln Town Car owned by Toriano Lewis ("Lewis"), but adamantly denied shooting Fannie Beard. Leach was familiar with Beard and acknowledged selling her heroin on at least one occasion. According to other testimony, Leach may have been the only drug dealer in Whitcomb Court who was willing to supply Beard.

Leach had heard from the defendant that a federal informant was operating in their area, but was unaware that the person being referred to was Beard. After the defendant was indicted, he asked Leach about a "snitch" living in his mother's apartment building. The defendant also inquired whether "Patsy" lived above his mother. Leach claims he told him he didn't know.

Leach described the defendant as someone he had known for a few years. As to the evening of December 1, 2006, Leach testified that the defendant flagged him down in the Jackson Ward area of Richmond between 9:00 and 10:00 p.m. They eventually drove to Whitcomb Court. Finding no other available parking places, they pulled up in the alley adjacent to 1907 Whitcomb Street. Leach contends that he went inside to visit his mother who was hosting a social gathering, hoping to borrow money to purchase the white Lincoln from Lewis and get "a piece of chicken." He estimated being in his mother's apartment approximately five minutes. The defendant, according to Leach, remained outside.

As Leach stepped out of the building, he recalled encountering his sister coming in with another young lady. Leach also testified that two ladies, one of which was apparently Fannie Beard, were leaving the building behind him. He walked toward the waiting Lincoln. When he turned the corner and approached the driver's side rear door, he heard a gunshot and immediately ducked behind the car. Seconds later, Leach stood up and observed the defendant shooting Beard. The defendant quickly "hopped into the car" and they drove off drinking Henessey cognac. Leach claims there was no discussion between them about the shooting.

Leach then testified that he drove the defendant to Jackson Ward, dropped him off, and picked up Carlton Massenburg ("Massenburg"). He and Massenburg had a prearranged rendevous with two women at a hotel and ended the evening playing dice at a neighborhood "social." During the game, he received a telephone call from his mother summoning him to her apartment to speak with Richmond City Police. There, he was arrested for Conspiracy to Commit Murder and transported to a police precinct for questioning. Despite being allegedly told that he wouldn't be charged with murder if he was cooperative, he declined to make any statement to the investigators. State charges were eventually dropped, and Leach pled guilty in U.S. District Court to Misprision of a Felony. Pursuant to the underlying plea agreement, Leach agreed to cooperate in the investigation of the Beard homicide in exchange for immunity from further prosecution.

Other evidence disclosed that Leach's recollection was the product of a slow

evolution. Special Agent John Kohler of the FBI testified that he conducted three interviews of Leach. During the first interview, which took place on January 26, 2007, Leach said that on the morning of December 2, 2006, he went into his mother's apartment to get money and chicken, leaving the defendant in the car. When he returned, he heard shots fired and saw the defendant standing near Beard. Leach, however, neither mentioned a gun nor identified the shooter.

Approximately two months later, on March 15, 2007, during a second interview, Leach told Agent Kohler that he heard shots as he walked from his mother's building, ducked down, and heard more shots. When he stood up, he observed the defendant standing over Beard's body, placing an unidentified object in his waistband. Again, Leach maintained that he did not see a firearm.

On April 5, 2007, Leach added a few more critical details. He informed Agent Kohler that he saw the defendant shoot Beard twice with a firearm. He also advised Kohler that earlier in the evening of December 1, he had been playing dice with Massenburg, prior to encountering the defendant. Because of his gambling losses, he needed to borrow money from his mother to pay Lewis for the Lincoln, which he had earlier agreed to purchase.

There are significant inconsistencies in Leach and Barbour's testimony. Barbour never mentioned a second woman with Beard, as described by Leach. Moreover, she observed the shooter, wearing a grey-hooded sweatshirt, exit the building portico.

According to Leach, only he entered the building. The defendant, who he now contends was the shooter, remained outside. Although Barbour testified that the shooter was too short to be Leach, the physical description of that individual she gave police on the morning of the homicide, based on her momentary glance, 5'6" and 130 pounds, was more consistent with Leach than the defendant. Ross Leach is 5'6" and 140 pounds.

To prove a motive for the Beard homicide, the United States first called Keisha Williams ("Williams") as a witness. Williams, who is closely affiliated with the Brick Yard Boys, pled guilty to Distribution of a Detectable Amount of Cocaine Base and is serving a sentence of 41 months' imprisonment. She readily acknowledged having an extensive prior record and that she hoped to receive some sentence reduction in exchange for her cooperation. She portrayed herself as a drug courier for the BYB gang, of which the defendant was a part. She stated that she had known the defendant between five and seven years, had cooked up cocaine for him, and had seen him in possession of a firearm during drug transactions.

Williams recalled that in July 2006, Fannie Beard approached her in Gilpin Court to buy cocaine. Aware that the defendant, who she referred to as "Duke," had cocaine available, she took Beard to the defendant's location. Beard purchased 1.4 grams of cocaine base from the defendant in Williams's presence. Unbeknownst to Williams and the defendant, Beard was wearing a video recording device, which captured the transaction on tape. Also included on the tape was an invitation by Beard for Williams to

join her at her apartment to get high. Beard then took the further step of giving Williams her home address, 1907 Whitcomb Street, on the tape. The defendant apparently had an opportunity to view this tape as part of the discovery in his state prosecution for that distribution.

In the Fall of 2006, Williams again encountered the defendant in Gilpin Court. She was startled when the defendant yelled to her, "Your name is on my indictment." The defendant then asked her about the lady she had brought to him to purchase cocaine. He asked, "Do you know where she lives?" Williams replied that she didn't know the address, but she did know "where it's at."

Approximately one week later, Williams was escorted by two men, who she did not know, to an awaiting vehicle. As instructed, she directed them to 1907 Whitcomb Street and pointed out the specific building where Beard resided. One of the men with her made a telephone call to report that Beard's residence had been located. She was then driven to a BP gas station where she again met with the defendant. In a stern voice he demanded to know "is that the address? It better be the address."

Williams later learned that Beard had been killed. The next time she saw the defendant, she told him, "They're trying to say you killed Patsy." The defendant sharply rebuked, "Don't question my moves."

Calton Massenburg ("Massenburg"), who is serving a 60-month sentence for making false statements to federal agents, testified that on the evening of December 1, he

loaned the white Lincoln he was driving to Leach. He and Leach were shooting dice at the time. Leach borrowed the Lincoln to drive a girl home, but intended to return later as they had dates at the Super 8 motel.

Later that evening, Massenburg came into contact with the defendant in a bathroom at a "social." The defendant said he, "just got the female who wore the wire" on him. The following day, Massenburg sold the white Lincoln, which was actually titled to Toriano Lewis. Massenburg admitted that the Division of Motor Vehicle documents were backdated to November 30, 2006, to conceal the vehicle's involvement in the Beard homicide.

On cross-examination, Massenburg, who also as part of his plea agreement received immunity from further prosecution in exchange for his cooperation, acknowledged visiting Kevin Valentine ("Valentine") on December 2, 2006. He, however, adamantly denied that he ever told Valentine and his girlfriend, Aquanda Brown ("Brown"), that the white Lincoln was "hot," or that they had killed "the bitch" who was wearing a wire.

Massenburg further admitted he had lied to federal agents during their first interview when he said he knew nothing about the Beard murder or related drug-trafficking activity. He later explained that he wanted to "clean out" his residence before disclosing his drug-trafficking activities to federal agents. He also noted that the first interview focused primarily on drug trafficking, not the Beard homicide.

Valentine and Brown, called as defense witnesses, told a different story. Valentine, who is serving 20 years for what he described as a federal drug conspiracy, testified that Massenburg had introduced him to Leach and that he had sold heroin to both Massenberg and Leach a couple of times.

Valentine was surprised when Massenburg and Lewis visited his house shortly after the homicide driving a rental car. They told him that they had sold the white Lincoln Town Car and were interested in purchasing his girlfriend's 1992 Ford Crown Victoria. During their conversation, Massenburg said that the Lincoln "was hot." Valentine inquired further as to why. Massenburg then said, "we killed the bitch," because she was wearing a wire and working for the police.

Brown corroborated Valentine's account of the visit by Lewis and Massenburg. Brown, however, did not participate directly in the conversation which occurred outside. She explained that their Chesterfield home was equipped with a closed-circuit television system that allowed her to overhear Valentine's conversation with Massenburg and Lewis. Brown testified that she heard Massenburg say the police were looking for the white Lincoln. She also recalled hearing him say that some lady was wearing a wire and they had to get rid of her.

Brown conceded that she had failed to mention Massenburg's comments about killing an informant in her initial interview with law enforcement officers in November 2007. It was not until a later interview in February of 2008 that she revealed the

comment about getting rid of the informant. At the time of her testimony, Brown was serving a 60-month federal sentence for making a false statement in connection with the purchase of a firearm.

Aside from the testimony of investigating officers, the balance of the evidence presented consisted of statements made by prisoner informants. The government first called William Wyche ("Wyche"), who claimed to have had a conversation with the defendant at the Richmond City Jail. Wyche testified that the defendant admitted killing Beard because she had worn a wire and "snitched" on him. When Wyche was transferred to Henrico County Jail, he contends that the defendant gave him a message for Ross Leach, "keep your mouth shut." Wyche admitted on cross-examination that he was a friend of Fannie Beard's son, Rodney.

Detective David E. Burt, a homicide investigator with the Richmond City Police Department, testified that he interviewed an inmate in the Richmond City Jail named Norman Forbes ("Forbes"). Forbes, who requested no consideration for his cooperation, advised Detective Burt that the defendant had told him that Patsy Beard had "worn a wire against the Brick Yard Boys and they had to lay her down."

Andre Simpson ("Simpson") had several encounters with the defendant at the Richmond City Jail. Most notably was a conversation in the Spring of 2007, after Beard had been murdered. According to Simpson, the defendant admitted killing Beard and tossing the firearm into the river along the canal walk. Simpson also said that he had seen

11

the defendant carrying a firearm at least five times during 2005. Although Simpson indicated that he was receiving no consideration for his testimony, jail records cast doubt on his credibility. The records in the Richmond City Jail, introduced through Lt. Colonel Roy C. Witham, indicated that the defendant and Simpson were not confined together in that institution during 2007 as Simpson maintained.

The last prisoner informant called by the United States was Rodney Powell ("Powell"), who is serving a five-year sentence for bank fraud. Powell stated that he and the defendant were confined in cellblock E in the Pamunkey Regional Jail during 2008. Someone in the cellblock mentioned an article in the newspaper discussing the dismissal of capital murder charges against the defendant. According to Powell, the defendant ripped the article out of the paper and announced that he had "shot the bitch for wearing a wire." Powell, who had 11 prior felony convictions, admitted testifying previously for the Richmond City Commonwealth Attorney's Office in exchange for the dismissal of a murder charge. He also acknowledged that he hoped to receive some type of consideration for his cooperation against the defendant in this case.

The defense countered with evidence of alleged conversations that Leach had with other inmates while confined at various institutions. Paul White ("White"), presently an inmate at FCI Fairton, testified that in February 2008, he had a conversation with Leach at the Northern Neck Regional Jail. As White described it, Leach said that he killed a lady who was "telling on my home boys." Leach indicated to White that he had used a .40

caliber firearm. On cross-examination, White conceded that he had discussed Leach's case with other inmates at FCI Fairton. White also mentioned that he had learned that Leach was returning to court for a possible sentence reduction.

The defense next called Larry Smith ("Smith"), a private investigator and former Special Agent with the Federal Bureau of Investigation. Smith conducted interviews of three other inmates at FCI Fairton who claimed to have discussed the Fanny Beard homicide with Leach. All three had notified the government of statements allegedly made by Leach, admitting direct involvement in the Beard homicide. Upon learning that they were potential defense witnesses, and would therefore receive no sentence reductions for cooperation, the three informants declined to testify.

Finally, Special Agent John Large of the FBI was called by the government as a rebuttal witness. Special Agent Large testified that he interviewed each of the three inmate informants from FCI Fairton described by Smith. He found their stories strikingly similar. Special Agent Large also testified that on a later occasion, one of the inmate informants recanted significant portions of his prior statement. Others had significantly changed their stories during subsequent interviews.

On November 7, 2007, a four-count Indictment was returned against the defendant. Count One charged him with retaliating against an informant resulting in murder, in violation of 18 U.S.C. § 1513(a)(1)(B), (a)(2)(A) and 2. Count Two charged the defendant with use and carrying a firearm causing death to another, in violation of 18

U.S.C. §§ 924(c), 924(j) and (2). Count Three charged possession of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), and Count Four with conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846.

On February 21, 2008, the United States filed a Notice of Intent to Seek a Sentence of Death, pursuant to 18 U.S.C. § 3593(a) on Counts One and Two. Subsequently, on July 22, 2008, a Superceding Indictment was returned by the grand jury. Aside from adding a fifth count for possession of firearm ammunition by a convicted felon, the Superceding Indictment tracked the original version.

On August 25, 2008, the government formally abandoned its intention to seek a sentence of death on Counts One and Two. Simultaneously, the government filed a Notice of Intention to Seek a Sentencing Enhancement, pursuant to 21 U.S.C. § 851 on Count Four, charging conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base. Two days later, the government presented an order to the Court unconditionally dismissing all counts of the Indictment, except for Count Four. Based on the evidence presented in connection with the immediate motion to apply a cross reference to first degree murder, the government's decision reflected sound prosecutorial judgment.

In certain instances, the Guidelines instruct the sentencing court to apply an offense guideline for criminal conduct other than the offense of conviction. Such

application of other offense guidelines is referred to as a cross reference. *See U.S.S.G.* §1B1.5. In the case of drug trafficking offenses, Section 2D1.1(d)(1) specifically provides for a cross reference when a homicide occurs during the course of drug trafficking activity.

> If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder) or §2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline.

*See U.S.S.G.* §2D1.1(d)(1). Murder is defined under 18 U.S.C. § 1111 as "the unlawful killing of a human being with malice aforethought." *Id.* To apply the cross reference to first degree murder, as urged by the United States, the underlying facts must demonstrate that the murder was willful, deliberate, malicious, and premeditated. *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003).

In preparing the Presentence Investigation Report in this case, the U.S. Probation Officer conducted an exhaustive review of the results of the government's investigation of the death of Fannie Beard. In the probation officer's view, the evidence was insufficient to support a cross reference to first degree murder, pursuant to U.S.S.G. §2D1.1(d)(1). After hearing the testimony of 16 witnesses called by both the government and the defense over a two-day period, the Court concurs in the Probation Officer's conclusion.

In order to prevail on their objection to the probation officer's computation of the

15

guidelines in this case, the government must demonstrate by a preponderance of the evidence that the defendant participated in the willful, deliberate, malicious, and premeditated murder of Fannie Beard. *See United States v. Vinson*, 886 F.2d 740, 741-42 (4th Cir. 1989). While the evidence raises strong suspicion of the defendant's involvement in the homicide, it fails to convince the Court, by a preponderance of the evidence, that he was a participant either directly or as a co-conspirator.

Both eyewitnesses gave conflicting accounts of what they observed on December 2, 2006. Barbour, whose testimony invited more questions than it answered, admitted that she could not identify the shooter. Leach, who was arguably a principal to the homicide himself, received significant legal consideration for implicating the defendant. Furthermore, there was testimony from four different sources that Leach admitted killing Beard himself. The balance of the witnesses called by both sides fell into two distinct categories. First, law enforcement officers who merely recounted what they heard from other individuals and, second, an assortment of prisoner witnesses who were seeking a reduction in their sentences in exchange for cooperation. It is also important to note that the inmate witnesses were almost equally divided in their testimony—four claimed the defendant admitted committing the homicide, and four claimed that Leach took credit for killing Beard. Moreover, most gave conflicting accounts to federal agents on different occasions.

Aside from law enforcement officers, the witnesses called on both sides were of

marginal credibility. The evidence is unfortunately in irreconcilable conflict. The collective picture is simply too unreliable and unconvincing to enable tenable findings of fact. Consequently, the government's objection to the U.S. Probation Officer's computation of the Guidelines in this case is overruled.

With respect to the defendant's objection to the firearm enhancement, the evidence supports the two-level increase by a fair preponderance. That objection is also overruled.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Jan. 20, 2009
Richmond, VA